ORAL ARGUMENT NOT YET SCHEDULED

No. 22-3072

# In the United States Court of Appeals for the District of Columbia Circuit

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

v.

KHAN MOHAMMED,

*Defendant-Appellant*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
D. CT. NO. 1:06-CR-357 (KOLLAR-KOTELLY, J.)

———————

FINAL APPELLEE BRIEF FOR THE UNITED STATES

———————

KENNETH A. POLITE, JR.
    Assistant Attorney General

LISA H. MILLER
    Deputy Assistant Attorney General

KAITLIN J. SAHNI
    Trial Attorney
    Criminal Division,
    Narcotic and Dangerous
        Drugs Section

J. BENTON HURST
    Trial Attorney
    Criminal Division, Appellate Section
    U.S. Department of Justice
    400 E. 9th St., Ste. 5510
    Kansas City, MO 64106
    (816) 426-3122
    john.benton.hurst@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), the undersigned certifies as follows:

### I. Parties and Amici

The parties appearing in the district court were the United States of America as plaintiff and Khan Mohammed as defendant. The parties appearing in this Court on appeal are the United States as appellee and Khan Mohammed as appellant. There are no intervenors or *amici*.

### II. Rulings Under Review

Mohammed is appealing the order and accompanying memorandum opinion by the district court (Kollar-Kotelly, J.), both entered on July 18, 2022, finding that he qualifies for the victim-related adjustment of U.S.S.G. § 3A1.4, as well as the amended judgment and sentence entered on October 17, 2022. The memorandum opinion and order are not published in the Federal Supplement but are available at 2022 WL 2802353. There are no official citations to the judgment.

### III. Related Cases

This Court previously affirmed Mohammed's convictions and sentence but remanded for an evidentiary hearing on his ineffective-

assistance claim. *United States v. Mohammed*, 693 F.3d 192 (D.C. Cir. 2012). On appeal following remand, the Court reversed the district court's finding that trial counsel's ineffectiveness did not prejudice Mohammed as to his second count of conviction. *United States v. Mohammed*, 863 F.3d 885 (D.C. Cir. 2017). Counsel for the government is not aware of any other related cases in this Court or any other court involving substantially the same parties and the same or similar issues.

*/s/ J. Benton Hurst*
J. BENTON HURST
  Trial Attorney
  Criminal Division, Appellate Section
  U.S. Department of Justice
  400 East 9th Street, Room 5510
  Kansas City, MO 64106
  (816) 426-3122
  john.benton.hurst@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................vi

GLOSSARY OF ABBREVIATIONS .......................................................xiii

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF THE ISSUES ...................................................................1

STATEMENT OF STATUTES AND REGULATIONS.............................2

STATEMENT OF THE CASE ......................................................................2

    I.    Statement of Facts .....................................................................2

    II.    Procedural History ....................................................................5

        A.    Conviction and Initial Sentencing .................................5

        B.    Prior Appellate Proceedings ...........................................8

        C.    District Court Vacates the Narcoterrorism Conviction....................................................................11

        D.    District Court Reimposes the Terrorism Adjustment at Resentencing .......................................12

SUMMARY OF ARGUMENT .................................................................15

ARGUMENT ...............................................................................................18

    I.    The district court did not plainly err in failing to hold that U.S.S.G. § 3A1.4 conflicts with Section 730 of the Anti-Terrorism and Effective Death Penalty Act of 1996. ...................................................................................18

        A.    Standard of Review......................................................18

        B.    Discussion....................................................................20

            1.    Section 3A1.4 does not conflict with the congressional directive in AEDPA. .....................21

2.     Any error was not plain.......................................29

II.     The district court correctly resolved application of the
        Section 3A1.4 adjustment under the preponderance of
        the evidence standard. ..........................................31

    A.     Standard of Review.......................................32

    B.     Discussion....................................................32

        1.     The district court correctly applied a
               preponderance standard.......................................32

        2.     Mohammed's contrary contentions lack
               merit. ...................................................36

III.    The district court did not plainly err in finding that
        Mohammed's drug-trafficking offense was intended to
        promote a federal crime of terrorism. ...................................40

    A.     Legal Framework and Standard of Review .................41

    B.     The law-of-the-case and law-of-the-circuit
           doctrines bar review.....................................44

    C.     The district court did not clearly err in finding that
           Mohammed intended his drug-trafficking offense
           to promote a federal crime of terrorism. ......................49

        1.     The district court's finding that Mohammed
               intended to promote terrorism crimes by
               using drug-trafficking proceeds to purchase
               a car to transport missiles is not clearly
               erroneous.............................................49

        2.     The record also supports the district court's
               alternative finding that Mohammed
               intended his drug trafficking to promote
               narcoterrorism. ...................................54

iv

IV.   This Court should not hold this case in abeyance while the Sentencing Commission considers whether to amend the guidelines to address acquitted conduct............59

CONCLUSION .........................................................................61

# TABLE OF AUTHORITIES

## Cases

*Al Bahlul v. United States*,
   767 F.3d 1 (D.C. Cir. 2014) (en banc) ................................................. 19

*Anderson v. City of Bessemer City, N.C.*,
   470 U.S. 564 (1985) ...................................................................... 39, 43

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019) ................................................................. 28, 29

*Concepcion v. United States*,
   142 S. Ct. 2389 (2022) ........................................................................ 60

*Dillon v. United States*,
   560 U.S. 817 (2010) ........................................................................... 60

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005) ........................................................................... 28

*In re Sealed Case*,
   573 F.3d 844 (D.C. Cir. 2009) ............................................................ 30

*LaShawn A. v. Barry*,
   87 F.3d 1389 (D.C. Cir. 1996) (en banc) ................................. 44-46, 48

*Lebron v. Nat'l R.R. Passenger Corp.*,
   513 U.S. 374 (1995) ........................................................................... 59

*Mistretta v. United States*,
   488 U.S. 361 (1989) ........................................................................... 21

*Puckett v. United States*,
   556 U.S. 129 (2009) ............................................................. 19-20, 29

*Authorities upon which the government chiefly relies are marked with asterisks.

*Shea v. Kerry*,
    796 F.3d 42 (D.C. Cir. 2015) ............................................................. 59

*Strickland v. Washington*,
    466 U.S. 668 (1984) ......................................................................... 38

*Townsend v. Burke*,
    334 U.S. 736 (1948) ......................................................................... 40

*United States v. Alhaggagi*,
    978 F.3d 693 (9th Cir. 2020) ........................................................... 34

*United States v. Ali*,
    799 F.3d 1008 (8th Cir. 2015) ......................................................... 56

*United States v. Arcila Ramirez*,
    16 F.4th 844 (11th Cir. 2021) .................................................... 21, 33

*United States v. Arnaout*,
    431 F.3d 994 (7th Cir. 2005) ................................................. 21, 31, 34

*United States v. Awan*,
    607 F.3d 306 (2d Cir. 2010) .................................................... 21, 56

*United States v. Baldwin*,
    563 F.3d 490 (D.C. Cir. 2009) ......................................................... 30

*United States v. Bell*,
    795 F.3d 88 (D.C. Cir. 2015) ........................................................... 33

*United States v. Booker*,
    543 U.S. 220 (2005) ......................................................................... 34

*United States v. Booze*,
    108 F.3d 378 (D.C. Cir. 1997) ......................................................... 40

*United States v. Bras*,
    483 F.3d 103 (D.C. Cir. 2007) ......................................................... 33

*United States v. Brice,*
748 F.3d 1288 (D.C. Cir. 2014) .......................................................... 47

*United States v. Chandia,*
675 F.3d 329 (4th Cir. 2012) ............................................................... 34

*United States v. Dorcely,*
454 F.3d 366 (D.C. Cir. 2006) ............................................................ 33

*United States v. El-Mezain,*
664 F.3d 467 (5th Cir. 2011) ............................................................... 56

*United States v. Erazo,*
628 F.3d 608 (D.C. Cir. 2011) ............................................................ 43

*\*United States v. Fahnbulleh,*
752 F.3d 470 (D.C. Cir. 2014) ................................................ 33, 37, 39

*United States v. Fidse,*
862 F.3d 516 (5th Cir. 2017) .................................................... 21, 25, 34

*\*United States v. Fisher,*
502 F.3d 293 (3d Cir. 2007) .......................................................... 35-36

*United States v. Garey,*
546 F.3d 1359 (11th Cir. 2008) ........................................................... 27

*United States v. Gatling,*
96 F.3d 1511 (D.C. Cir. 1996) ............................................................ 44

*United States v. Graham,*
275 F.3d 490 (6th Cir. 2001) .............................................. 21, 25, 31, 34

*United States v. Grubbs,*
585 F.3d 793 (4th Cir. 2009) ............................................................... 35

*United States v. Haight,*
850 Fed. App'x 5 (D.C. Cir. 2021) ...................................................... 48

*United States v. Hasson,*
    26 F.4th 610 (4th Cir. 2022) ..............................21, 23-25, 27, 29, 31, 34

*United States v. Jackson,*
    161 F.3d 24 (D.C. Cir. 1998) ................................................................33

*United States v. Jayyousi,*
    657 F.3d 1085 (11th Cir. 2011) ...........................................................56

*United States v. Jones,*
    744 F.3d 1362 (D.C. Cir. 2014) ...........................................................33

*United States v. Kikumura,*
    918 F.2d 1084 (3d Cir. 1990) ...............................................................35

*United States v. Kobito,*
    994 F.3d 696 (4th Cir. 2021) ........................................................21, 53

*United States v. LaBonte,*
    520 U.S. 751 (1997) .....................................................................21, 22

*United States v. Laureys,*
    653 F.3d 27 (D.C. Cir. 2011) .........................................................29-31

*United States v. Long,*
    328 F.3d 655 (D.C. Cir. 2003) ........................................... 32-33, 37-38

*United States v. Long,*
    997 F.3d 342 (D.C. Cir. 2021) ......................................................20, 30

*United States v. Lutcher,*
    No. 03-cr-338, 2009 WL 1457980 (E.D. La. May 26, 2009) ...............38

*United States v. Mandhai,*
    375 F.3d 1243 (11th Cir. 2004) ....................................................25, 53

*United States v. Meadows,*
    867 F.3d 1305 (D.C. Cir. 2017) ...........................................................30

*United States v. Mohammed,
   693 F.3d 192 (D.C. Cir. 2012)..3-5, 8-9, 14, 17, 42-45, 47-49, 51, 53-54

United States v. Mohammed,
   863 F.3d 885 (D.C. Cir. 2017) ...................................................10-11, 56

United States v. Olibrices,
   979 F.2d 1557 (D.C. Cir. 1992) ...........................................................26

United States v. Philip Morris USA Inc.,
   801 F.3d 250 (D.C. Cir. 2015) .........................................................44-45

United States v. Reuter,
   463 F.3d 792 (7th Cir. 2006)...........................................................34-35

United States v. Settles,
   530 F.3d 920 (D.C. Cir. 2008) ........................................................33, 40

United States v. Smaw,
   22 F.3d 330 (D.C. Cir. 1994) ...............................................................60

United States v. Smith,
   896 F.3d 466 (D.C. Cir. 2018) ..............................................................58

United States v. Staten,
   466 F.3d 708 (2006)......................................................................35-36, 39

United States v. Stein,
   985 F.3d 1254 (10th Cir. 2021) ............................................................33

United States v. Turner,
   21 F.4th 862 (D.C. Cir. 2022) ..............................................................18

United States v. Ventura,
   650 F.3d 746 (D.C. Cir. 2011) ..............................................................33

United States v. Villareal-Amarillas,
   562 F.3d 892 (8th Cir. 2009).................................................................35

*United States v. Watts,*
   519 U.S. 148 (1997) ................................................................ 32, 34, 40

*United States v. Williams,*
   773 F.3d 98 (D.C. Cir. 2014) ............................................................ 30

*Williams v. United States,*
   No. 08-cv-513, 2010 WL 1382762 (S.D. Ala. Mar. 3, 2010),
   *report and recommendation adopted,* 2010 WL 1382761 (S.D.
   Ala. Apr. 1, 2010) .......................................................................... 39

**Statutes**

18 U.S.C. § 2 ...................................................................................... 6

18 U.S.C. § 32 .................................................................................... 6

18 U.S.C. § 2331 ................................................................... 22, 24, 28

18 U.S.C. § 2332 ................................................................................ 6

18 U.S.C. § 2332a .............................................................................. 7

18 U.S.C. § 2332b ..................................... 6-7, 24, 28, 41, 45, 56

18 U.S.C. § 2339A .............................................................................. 7

18 U.S.C. § 3231 ................................................................................ 1

21 U.S.C. § 841 .................................................................................. 6

21 U.S.C. § 959 .................................................................................. 6

21 U.S.C. § 960 .................................................................................. 6

21 U.S.C. § 960a ...................................................... 6-7, 14, 54

*Antiterrorism and Effective Death Penalty Act of 1996, Pub. L.
   No. 104-132, 110 Stat. 1214 ............................................... 23, 25

Violent Crime Control and Law Enforcement Act of 1994, Pub. L.
No. 103-322, 108 Stat. 1796 .......................................................... 22, 24

## Other Authorities

88 Fed. Reg. 28254-01 (May 3, 2023) ........................................................ 60

H.R. Rep. No. 104-518 (1996) ................................................................... 28

Sentencing Guidelines for the United States Courts, 88 Fed. Reg.
7180-01 (Feb. 2, 2023) ............................................................................. 59

## Rules and Sentencing Guidelines

Fed. R. App. P. 4 .......................................................................................... 1

Sentencing Guidelines app. C, Amend. 526 (Nov. 1, 1995) .................... 22

Sentencing Guidelines app. C, Amend. 539 (Nov. 1, 1996) .................... 23

Sentencing Guidelines app. C, Amend. 565 (Nov. 1, 1997) .................... 23

U.S.S.G. § 1B1.1 (1995) ........................................................................... 26

U.S.S.G. § 1B1.3 (1995) ........................................................................... 26

U.S.S.G. § 1B1.11 ...................................................................................... 59

U.S.S.G. § 2D1.1 ........................................................................................ 12

*U.S.S.G. § 3A1.4 ...................... 1, 2, 6, 12, 15, 18, 20, 22-23, 33-34, 40-41

U.S.S.G. § 5G1.1 ........................................................................................ 12

U.S.S.G. § 6A1.3 ........................................................................................ 39

# GLOSSARY OF ABBREVIATIONS

Br.             Appellant's opening brief

## JURISDICTIONAL STATEMENT

Defendant-appellant Khan Mohammed appeals from a post-remand order and accompanying memorandum opinion finding applicable a sentencing adjustment under U.S.S.G. § 3A1.4, JA.478-501, and from the district court's imposition of a life sentence, JA.504-510. The district court (Kollar-Kotelly, J.) had jurisdiction under 18 U.S.C. § 3231. The court imposed judgment on September 16, 2022, and entered an amended judgment on October 17, 2022. JA.504-510, 522. Mohammed's notice of appeal, filed before entry of the amended judgment (JA.502-03), was timely and effective under Fed. R. App. P. 4(b)(1)(A) and (b)(2). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether, on plain-error review, the terrorism adjustment in U.S.S.G. § 3A1.4 conflicts with the congressional directive in Section 730 of the Anti-Terrorism and Effective Death Penalty Act of 1996.

2.    Whether the district court erred in assessing application of the terrorism adjustment in U.S.S.G. § 3A1.4 under a preponderance of the evidence standard.

3.    Whether, in applying the terrorism adjustment in U.S.S.G. § 3A1.4, the district court clearly erred in finding that Mohammed's drug-trafficking offense was intended to promote a federal crime of terrorism.

4.    Whether this appeal should be held in abeyance while the Sentencing Commission considers whether to amend the guidelines to address acquitted conduct.

## STATEMENT OF STATUTES AND REGULATIONS

Pertinent statutes and regulations are produced in an addendum to Mohammed's brief.

## STATEMENT OF THE CASE

Mohammed was originally convicted after a jury trial of distributing heroin for importation into the United States and narcoterrorism. After prior remands from this Court, the district court vacated the narcoterrorism conviction and resentenced Mohammed for the drug-trafficking offense. At that resentencing, the court found that Mohammed still qualified for the terrorism adjustment of U.S.S.G. § 3A1.4 and reimposed a life sentence.

## I.    Statement of Facts

Mohammed is an Afghan national who schemed to, *inter alia*, supply dangerous drugs for distribution in the United States and procure

missiles to fire at U.S. personnel stationed at an airfield in Afghanistan. The facts underlying his offense conduct are set forth in this Court's opinion on direct appeal, *United States v. Mohammed*, 693 F.3d 192, 195-96 (D.C. Cir. 2012) (*Mohammed I*).

In brief, in 2006, an Afghan man named Jaweed was living in Pakistan. *Id.* at 195. A former Taliban official in Pakistan told Jaweed to return to Afghanistan and join Mohammed in planning an attack on the Jalalabad airport, a strategic NATO airbase in eastern Afghanistan. *Id.* Jaweed met with Mohammed, and Mohammed told Jaweed to obtain missiles to use in the strike. *Id.*

Jaweed disclosed the plot to Afghan authorities and, ultimately, to Drug Enforcement Administration (DEA) agents deployed to Afghanistan. *Id.* At the agents' behest, Jaweed began recording conversations with Mohammed. *Id.*

The first recorded conversation occurred on August 18, 2006. JA.50-61, 64-69, 88-106. Jaweed told Mohammed that he had obtained the missiles for the attack, and Mohammed said that he too had some weapons and was trying to get more. JA.88-89. Mohammed said: "These

are infidels[;] we will kill them and we will continue our Jihad with blessing." JA.90. He continued:

> The Americans are infidels and Jihad is allowed against them. If we have to fire [the missiles] toward the airport, we will do it and if not the airport, wherever they are stationed we will fire at their base too. I mean we have to use the mines too. God willing, we and you will keep doing our Jihad.

JA.91.

DEA agents planned to arrest Mohammed soon after Jaweed had given him the missiles, but they abandoned the plan because they were not confident they could maintain control of the missiles after giving them to Mohammed. *See Mohammed I*, 693 F.3d at 195. The agents decided instead to investigate Mohammed for narcotics trafficking, and they instructed Jaweed to tell Mohammed that he had a friend looking for opium. *See id.* Following this plan, Jaweed told Mohammed that he had a friend looking for opium, and Mohammed replied that he knew a source who could supply as much as Jaweed's friend needed. *Id.* The two met three more times to discuss the details of the opium transaction. *Id.*

They also discussed plans for the attack on the airfield. *Id.* On August 30, 2006, Mohammed told Jaweed that they would "tightly and firmly load [the missiles] in our car." *Id.* (quotations omitted); *see* JA.124.

4

Eleven days later, on September 10, Mohammed told Jaweed that he would use the profits from the drug sale to buy a car, which could help carry out more drug deals. *Mohammed I*, 693 F.3d at 195; JA.151.

Jaweed and Mohammed went to a local bazaar where Mohammed negotiated the opium purchase. *Mohammed I*, 693 F.3d at 195. They paid $2,750 for 11 kilograms of opium. JA.45-46, 81-83, 86.

DEA agents then asked Jaweed to arrange another drug deal, this time for heroin. *Mohammed I*, 693 F.3d at 195. Jaweed told Mohammed that his friend would send the opium and other narcotics he purchased to the United States, and Mohammed stated, "Good, may God turn all the infidels to dead-corpses." *Id.*; *see* JA.169-70. Mohammed added that the "common goal" was to eliminate the infidels, "[w]hether it is by opium or by shooting." *Mohammed I*, 693 F.3d at 195-96; JA.172. Mohammed ultimately sold Jaweed almost two kilograms of heroin. *Mohammed I*, 693 F.3d at 195.

## II.     Procedural History

### A.     Conviction and Initial Sentencing

In May 2008, a jury convicted Mohammed of distributing one kilogram or more of heroin intending or knowing that it will be

unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a)(1), 959(a)(2), 960(b)(1)(A) and 18 U.S.C. § 2 (the "drug-trafficking" offense); and distributing opium and more than one kilogram of heroin knowing or intending to provide anything of pecuniary value to a person or organization that has engaged or engages in terrorism or terrorist activity, in violation of 21 U.S.C. §§ 960a, 841(a), 841(b)(1)(A)(i) and 18 U.S.C. § 2 (the "narcoterrorism" offense). JA.179-80, 504-10.

At the initial sentencing, the Probation Office recommended an adjustment under U.S.S.G. § 3A1.4. JA.525 (¶ 31). Section 3A1.4 provides a 12-level adjustment and a criminal history category of VI where "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." The guidelines commentary provides that "federal crime of terrorism" has the meaning given in 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4 cmt. n.1. That section, in turn, defines "federal crime of terrorism" as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of, among other statutes, 18 U.S.C. § 32 (relating to destruction of aircraft or aircraft facilities), 18 U.S.C. § 2332 (relating to certain homicides and other

6

violence against United States nationals occurring outside of the United States), 18 U.S.C. § 2332a (relating to use of weapons of mass destruction), and 18 U.S.C. § 2339A (relating to providing material support to terrorists), and 21 U.S.C. § 960a (relating to narcoterrorism). 18 U.S.C. § 2332b(g)(5)(B).[1]

Although Mohammed conceded that his narcoterrorism offense was listed in Section 2332b(g)(5)(B), he objected to the adjustment on the ground, among others, that his offense was not calculated to influence or affect government conduct or retaliate against government conduct. JA.193-94, 195. The district court overruled his objection, finding that Mohammed "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan and the Afghani government and its official[s]." JA.201; *see* JA.197-99. It also found that "the sale itself of the drugs going abroad to U.S. cities he specifically intends and is motivated by the drugs' destructive powers on U.S. civilian populations as a means of violent jihad against Americans who have fighting forces in Afghanistan against

_____

[1] Section 2332b(g)(5)(B)(iv) identifies 21 U.S.C. § 960a as § 1010A of the Controlled Substances Import and Export Act.

the Taliban." JA.201; *see* JA.199-201. The court also rejected Mohammed's additional argument that it should resolve the application of Section 3A1.4 using a heightened standard of proof. JA.201-02; *see* JA.181-83.

The court sentenced Mohammed to concurrent terms of life imprisonment. JA.184-190.

### B.    Prior Appellate Proceedings

1.    On direct appeal, this Court affirmed Mohammed's conviction and sentence but remanded in one limited respect. *Mohammed I*, 693 F.3d at 205. As relevant here, Mohammed challenged the application of Section 3A1.4, arguing (as this Court summarized) that "the evidence does not establish that he intended to use the drug proceeds to buy a car to aid in the Jalalabad attack" and that "his statements cannot be read to support the conclusion of the district court that he was referring to the same car that he said earlier would carry the missiles." *Id.* at 201. Mohammed did not appeal the district court's decision to resolve the question using a preponderance standard. *See* Appellant's Br. 56, *United States v. Mohammed*, No. 09-3001 (filed Sept. 9, 2011) (stating that

8

Section 3A1.4 applies only if the government proves its requirements by a preponderance of the evidence).

This Court held that the district court did not clearly err in finding that Mohammed intended to use drug proceeds to purchase a car to aid in the attack on the airport. *Mohammed I*, 693 F.3d at 201-02. "The district court pointed to specific statements in the record—which Mohammed does not dispute he made—from which it drew plausible inferences." *Id.* at 202. "Although Mohammed's objection may show that the record can support alternate interpretations, it is far from proof that the district court's reading of these conversations is clearly erroneous." *Id.* at 201.[2]

Consistent with its practice for ineffective-assistance-of-counsel claims raised on direct appeal, this Court remanded for an evidentiary hearing to consider whether Mohammed's trial attorney provided ineffective assistance by failing to investigate the possibility that potential witnesses in Afghanistan could undermine Jaweed's credibility.

---

[2] Because this Court affirmed the district court's finding that Mohammed intended to use drug proceeds to purchase a car to commit terrorism, it did not address the court's alternative basis for applying the enhancement. *Mohammed I*, 693 F.3d at 201-02 & n.3.

*Id.* at 202-05. On remand, the district court rejected Mohammed's claim. JA.205-65.

2.    Mohammed appealed again, and this Court affirmed in part and vacated in part. *United States v. Mohammed*, 863 F.3d 885, 894 (D.C. Cir. 2017) (*Mohammed II*). This Court concluded that Mohammed's trial attorney rendered deficient performance by failing to take steps to undermine Jaweed's testimony. *Id.* at 890-92. It affirmed the district court's denial of Mohammed's motion to vacate his drug-trafficking conviction because "[e]ven if Jaweed had been effectively impeached and shown to be biased, the jury would have convicted based on Mohammed's own words." *Id.* at 892.

This Court vacated, however, the district court's denial of Mohammed's motion to vacate his narcoterrorism conviction because it could not, on the existing record, exclude the possibility of prejudice. *Id.* at 892-94. It could not be certain whether the jury convicted Mohammed because (i) Mohammed had personally engaged in terrorist activities, or (ii) he was acting as a conduit for the Taliban, a terrorist organization. *Id.* at 892-93. Because it was reasonably probable that the jury had convicted Mohammed on the latter theory, and because "Jaweed's

10

testimony was the only evidence that linked Mohammed to the Taliban"
and "thus provided critical support for the narcoterrorism charge," this
Court found it "reasonably probable that the jury would not have
convicted Mohammed if Jaweed's testimony could have been effectively
undermined." *Id.* at 892.

### C.     District Court Vacates the Narcoterrorism Conviction

On remand, Mohammed submitted affidavits from 16 witnesses.
*See* JA.292-413. Some witnesses alleged that Jaweed harbored a bias
against Mohammed because (i) Mohammad ruled that Jaweed robbed the
home of another villager as part of a community council called a *jirga* and
(ii) Mohammed won a local election over him. JA.422-26 (summarizing
the affidavits). Two witnesses alleged that Jaweed had a reputation as a
liar. *See* JA.426-27. The district court, observing that it found Jaweed a
credible witness, concluded that the government could have rebutted
evidence of Jaweed's reputation as a liar. JA.427. It also found, however,
that evidence of his bias may have swayed at least one juror to acquit on
the narcoterrorism charge. JA.427-40. The court therefore vacated the

narcoterrorism conviction. JA.414. The government elected not to seek retrial.[3]

## D. District Court Reimposes the Terrorism Adjustment at Resentencing

The Probation Office prepared a revised Presentence Investigation Report (Rev. PSR) in advance of resentencing on Mohammed's drug-trafficking conviction. The Probation Office recommended a base offense level of 30 under U.S.S.G. § 2D1.1. JA.531 (¶ 33). It also recommended a 12-level adjustment and a criminal history category of VI because Mohammed's offense is a felony that involved, or was intended to promote, a federal crime of terrorism. JA.532 (¶¶ 35, 45); *see* U.S.S.G. § 3A1.4. The Probation Office recommended a corresponding guidelines range of 360 months to life imprisonment. JA.534 (¶ 66).[4]

Mohammed objected to the PSR's recommendation that Section 3A1.4 adjustment be applied. He argued that his offense neither involved

---

[3] Jaweed had, in the interim, been killed upon his return to Afghanistan. *See* JA.452; *see* JA.520.

[4] Mohammed asserts (Br. 12) that without the Section 3A1.4 adjustment his guidelines range would have been 97 to 121 months. He fails to account for the statutory minimum of 10 years. JA.534 (¶ 65). Absent the adjustment, his guidelines range would have been 120 to 121 months. *See* U.S.S.G. § 5G1.1(c)(2).

nor was intended to promote a federal crime of terrorism. JA.468-71, 538-40. In his view, the district court could not impose the terrorism adjustment without Jaweed's testimony and could not rely on Jaweed's testimony because it had been "discredited as potentially unreliable." JA.468-71, 538-40. Mohammed further argued that the court should require clear and convincing evidence to apply the terrorism adjustment. JA.466-67. And he objected generally to the recitation of facts in the Revised PSR that he believed relied on Jaweed's testimony. JA.459-65, 536-38.

The government argued that Mohammed's drug trafficking "intended to promote" federal crimes of terrorism on two bases. First, the government argued that Mohammed's drug-trafficking offense was intended to promote several enumerated federal crimes of terrorism, such as destruction of aircraft and aircraft facilities, homicide of United States nationals outside of the United States with intent to retaliate against a government, and others, and that the court could reach that conclusion based on Mohammed's statements alone. JA.442-44, 445-46. And the court should, the government continued, also rely on Jaweed's testimony in reaching that conclusion because he was credible. JA.446-48. Second,

13

the government additionally argued that Mohammed intended to commit the crime of narcoterrorism in violation of 21 U.S.C. § 960a. JA.444.

The district court issued a 24-page opinion overruling Mohammed's objection and explaining its decision to apply the terrorism adjustment. JA.478-501. The court first explained that circuit precedent supported use of a preponderance standard, rejecting Mohammed's reliance on "several cases from the Ninth Circuit applying a clear and convincing standard of proof." JA.485-86. The court next reiterated its prior finding, which was based upon Mohammed's own statements and had been upheld by this Court on direct appeal, that he intended to use the commission from the drug sales to purchase a car to facilitate attacks against United States and foreign forces in Afghanistan and the Afghan government. JA.489 & n.5 (citing *Mohammed I*, 693 F.3d at 201-02 & n.3). The court then found that, without any reliance on Jaweed's testimony and regardless of whether Mohammed had any Taliban connection, Mohammed's plan to launch bombs and missiles at the airport specifically targeting the American "infidels" supported the terrorism adjustment. JA.490-92. The court further found, based on its observation of Jaweed's testimony at trial, that he was a credible witness

and that his testimony further supported the terrorism adjustment. JA.493-95.

The district court considered the factors in 18 U.S.C. § 3553(a) and reimposed a sentence of life. JA.512-22; *see* JA.495-500.

## SUMMARY OF ARGUMENT

Mohammed plotted to distribute dangerous drugs into the United States and to launch missile attacks against U.S. personnel at an airfield in Afghanistan—all part of a plan to retaliate against people he viewed as infidels. The district court has twice imposed a life sentence for that grave conduct, and Mohammed's efforts to undo that sentence in this third appeal all suffer from fatal flaws. He raises his lead claim for the first time on appeal and cannot establish plain error. A second contention concerning the standard of proof lacks merit. And his third complaint runs headlong into this Court's decision in his first appeal, where this Court rejected challenges to the district court's factual findings almost identical to those he presents here.

I.    The district court did not plainly err in failing to hold that the terrorism adjustment of U.S.S.G. § 3A1.4, as written and applied to Mohammed, conflicts with the 1996 congressional directive in AEDPA.

The Sentencing Commission reasonably understood statutory language providing that the adjustment "only applies to Federal crimes of terrorism" as a directive to change the type of terrorism to which the adjustment applied. But that directive did not also restrict the adjustment to only those defendants convicted of such a crime, as opposed to those defendants—like Mohammed—whose offenses of conviction or relevant conduct were "intended to promote" federal crimes of terrorism. Regardless, Mohammed cannot establish that any error is "clear" or "obvious," as no appellate court has accepted his argument, the Fourth Circuit recently rejected it in a thorough opinion, and two others have done so implicitly.

II.     The district court correctly assessed the application of Section 3A1.4 under a preponderance of the evidence standard. As the Supreme Court and this Court have both recognized, the use of a preponderance standard at sentencing does not generally deprive a defendant of due process. Consistent with that view, this Court has never required the use of a heightened standard in any case. Further, outside of the Ninth Circuit, courts have approved the use of a preponderance standard to assess the application of the terrorism adjustment. And the two factors

cited by Mohammed, even when taken together, do not amount to extraordinary circumstances that would justify application of a heightened standard for the first time ever in this circuit.

III.   This Court should not consider Mohammed's challenge to the application of the terrorism adjustment, because he relies on essentially the same argument this Court rejected in *Mohammed I*.

In any event, the district court did not clearly err in applying the terrorism adjustment to Mohammed, because the record shows that he intended his drug-trafficking offense to promote various federal crimes of terrorism. In particular, the record shows that he intended to purchase a car with drug proceeds, transport missiles in that car, and use those missiles to commit attacks calculated to affect, influence, or retaliate against government conduct. The record also shows that he intended his drug trafficking to promote narcoterrorism by promoting additional drug transactions that would provide pecuniary benefit to a terrorist—namely, himself.

IV.   Possible future action by the Sentencing Commission provides no basis to delay this appeal or remand to the district court. While the Commission was, at the time Mohammed filed his brief, considering an

amendment on the issue of "acquitted conduct," the Commission has since declined to promulgate that amendment for this year; the proposed amendment's definition of "acquitted conduct" would not apply to Mohammed; and the amendment also would not apply unless the Commission made it retroactive, in which case Mohammed could seek relief after the conclusion of this appeal.

## ARGUMENT

### I. The district court did not plainly err in failing to hold that U.S.S.G. § 3A1.4 conflicts with Section 730 of the Anti-Terrorism and Effective Death Penalty Act of 1996.

For the first time on appeal, Mohammed argues that the language of U.S.S.G. § 3A1.4 conflicts with the congressional directive in Section 730 of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). But he cannot establish error, much less plain error, where the Fourth Circuit recently (and correctly) rejected this argument, and no court of appeals has accepted it.

#### A. Standard of Review

When a defendant properly preserves a claim of error, this Court reviews "*de novo* the district court's interpretation of the Sentencing Guidelines in calculating a defendant's Sentencing Guidelines range." *United States v. Turner*, 21 F.4th 862, 865 (D.C. Cir. 2022) (quotations

18

omitted). To preserve error, a defendant must timely "state the specific ground for [the] objection" and do so "with sufficient precision to indicate distinctly [his] thesis." *Al Bahlul v. United States*, 767 F.3d 1, 9 (D.C. Cir. 2014) (en banc) (quotations omitted). This specificity requirement ensures that the contemporaneous-objection rule serves the purposes that animate it—*i.e.*, allowing trial courts to "correct or avoid the mistake so that it cannot possibly affect the ultimate outcome," and "prevent[ing] a litigant from 'sandbagging' the court [by] remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Puckett v. United States*, 556 U.S. 129, 134 (2009).

Here, Mohammed forfeited his lead claim of error. Although Mohammed objected to the applicability of Section 3A1.4 on other grounds, *see* JA.538-40, he raises for the first time in this Court the distinct claim that Section 3A1.4 as written conflicts with the congressional directive in AEDPA. Mohammed's objection on other grounds to the terrorism adjustment failed to preserve his new challenge to Section 3A1.4 for appeal. *See Al Bahlul*, 767 F.3d at 8-10 (holding error forfeited where defendant's contemporaneous objection to military

19

commission was "couched entirely in political and religious terms" instead of the later-raised statutory and *ex post facto* grounds).

Because Mohammed "seeks reversal on the basis of an argument . . . that he did not raise before the district court," this Court must review this argument only for plain error. *United States v. Long*, 997 F.3d 342, 352-53 (D.C. Cir. 2021). Under plain error review, this Court may reverse only if (1) the district court committed error; (2) the error is "plain"; (3) the error affects Mohammed's "substantial rights"; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 353 (quotations omitted). "Meeting all four prongs is difficult, as it should be." *Puckett*, 556 U.S. at 135 (quotations omitted).

## B.  Discussion

Section 3A1.4 applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." By its terms, the guideline can apply where the offense of conviction is not a federal crime of terrorism. First, a defendant's offense may "involve" a federal crime of terrorism if his relevant conduct includes such an offense even if his offense of conviction does not constitute one. *See United States v. Arcila*

*Ramirez*, 16 F.4th 844, 850 & n.5 (11th Cir. 2021); *United States v. Fidse*, 862 F.3d 516, 522 (5th Cir. 2017); *United States v. Awan*, 607 F.3d 306, 313-14 (2d Cir. 2010); *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005). Second, Section 3A1.4 "'applies whenever a defendant's offense of conviction or relevant conduct was "intended to promote" a federal crime of terrorism.'" *United States v. Hasson*, 26 F.4th 610, 621 (4th Cir. 2022) (quoting *United States v. Kobito*, 994 F.3d 696, 701-02 (4th Cir. 2021)); *accord Fidse*, 862 F.3d at 522; *Awan*, 607 F.3d at 315; *Arnaout*, 431 F.3d at 1002; *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001).

As explained below, Mohammed's argument (Br. 17-22) that Congress prohibited application in these circumstances lacks merit.

> **1.   Section 3A1.4 does not conflict with the congressional directive in AEDPA.**

a.   "Congress has delegated to the Commission 'significant discretion in formulating guidelines' for sentencing convicted federal offenders." *United States v. LaBonte*, 520 U.S. 751, 757 (1997) (quoting *Mistretta v. United States*, 488 U.S. 361, 377 (1989)). "Broad as that discretion may be, however, it must bow to the specific directives of

21

Congress." *Id.* If Section 3A1.4 is at odds with the plain language of the congressional directive, "it must give way." *Id.*

In 1994, Congress directed the Sentencing Commission "to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022. The Sentencing Commission responded by creating a new "International Terrorism" adjustment at Section 3A1.4 that read in part, "(a) If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32." U.S.S.G. § 3A1.4 (1995); *see* Sentencing Guidelines app. C, Amend. 526 (Nov. 1, 1995). "International terrorism" carried the definition set out in 18 U.S.C. § 2331. U.S.S.G. § 3A1.4 cmt. n.1 (1995).

Less than two years later, Congress directed the Commission to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of

22

terrorism, as defined in section 2332b(g) of title 18, United States Code."

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L.

No. 104-132, § 730, 110 Stat. 1214, 1303. The Commission responded by

retitling Section 3A1.4 "Terrorism" and replacing the reference to

"international" with "a federal crime of." U.S.S.G. § 3A1.4 (1996); *see*

Sentencing Guidelines app. C, Amend. 539 (Nov. 1, 1996); Sentencing

Guidelines app. C, Amend. 565 (Nov. 1, 1997).

     b.    As the Fourth Circuit recently explained in a thorough

opinion, AEDPA's text and history support the application of Section

3A1.4 to defendants whose crime of conviction or relevant conduct was

intended to promote a federal crime of terrorism. *See Hasson*, 26 F.4th at

623. Starting with statutory text, Congress's directive to "amend the

sentencing guidelines so that the chapter 3 adjustment relating to

international terrorism only applies to Federal crimes of terrorism,"

§ 730, 110 Stat. at 1303, is "reasonably read as instructing the

Commission to edit the type of terrorism to which the adjustment applies

by replacing 'international terrorism' with 'federal crimes of terrorism,'

which the Commission did," *Hasson*, 26 F.4th at 623. "International

terrorism" includes certain acts that violate federal and state statutes (or

would violate such statutes if committed within federal or state jurisdiction) and occur primarily outside United States territory or transcend national boundaries, while "Federal crimes of terrorism" includes acts that violate a list of federal statutes without any territorial restriction. *Compare* 18 U.S.C. § 2331 (defining "international terrorism"), *with id.* § 2332b(g)(5) (defining "Federal crime of terrorism").

The statutory history supports that understanding, as AEDPA did not express a clear intent to undo the 1994 directive that the adjustment apply to a defendant whose offense "intends to promote," as well as to one whose offense "involves," terrorism. In 1994, Congress expressly directed the Sentencing Commission to promulgate an enhancement for "any felony . . . that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime." § 120004, 108 Stat. at 2022. "[T]hat disjunctive phrase creates two ways in which the adjustment can be triggered: (1) by an offense that 'involves' terrorism, or (2) by an offense 'intended to promote' terrorism." *Hasson*, 26 F.4th at 623.

"The 1996 directive did not purport to reduce these two options to one; indeed, it said nothing about the offenses to which the adjustment

24

applies or their relationship to the crime of terrorism." *Hasson*, 26 F.4th at 623. AEDPA required the Sentencing Commission to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism." § 730, 110 Stat. at 1303. "If Congress had intended to completely rewrite the precise language it had dictated less than two years prior," the Fourth Circuit soundly reasoned, "we expect it would have done so more clearly." *Hasson*, 26 F.4th at 623. "Instead, Congress's 1996 directive focused on the nature of the terrorism involved, which is but one facet of Section 3A1.4, and the Commission changed that aspect of the adjustment in response." *Id.*

In addition, Congress has acquiesced in more than two decades of judicial decisions holding that Section 3A1.4 may apply to defendants who have not been convicted of a federal crime of terrorism. *See Hasson*, 26 F.4th at 621-24; *Fidse*, 862 F.3d at 521-27; *United States v. Mandhai*, 375 F.3d 1243, 1247-48 (11th Cir. 2004); *Graham*, 275 F.3d at 516-19. That Congress, which directed changes to the terrorism adjustment less than two years apart in 1994 and 1996, has done nothing since supports

the conclusion that the Sentencing Commission in promulgating Section 3A1.4 and courts in applying it have not deviated from Congress's intent.

c.       In the face of this judicial consensus, Mohammed asserts (Br. 17-22) that Congress intended to limit application of the terrorism adjustment to those *convicted* of federal crimes of terrorism. That view lacks merit. As a textual matter, the term "applies" in Section 730 does not bear the weight of such a substantial deviation from the general guidelines principle that, when calculating adjustments, a court must consider not only the offense of conviction but also relevant conduct. *See generally United States v. Olibrices*, 979 F.2d 1557, 1560 (D.C. Cir. 1992) (stating the general principle that adjustments must be calculated using relevant conduct); U.S.S.G. § 1B1.1 cmt. n.1(l) (1995); *id.* § 1B1.3(a) (1995).

Mohammed argues (Br. 21-22) that if Congress had intended the interpretation described above, it "would much more likely have simply directed the Commission to 'substitute' the phrase 'Federal crime of terrorism' for 'international terrorism.'" But this premise does not advance Mohammed's argument, because if Congress had intended the interpretation Mohammed proposes, it would have written that the

26

adjustment only applies to a defendant "convicted of" a federal crime of terrorism. *See Hasson*, 26 F.4th at 623 ("If Congress had intended to completely rewrite the precise language it had dictated less than two years prior, we expect it would have done so more clearly.").

Mohammed similarly errs (Br. 19-20) in contending that Congress's use of "only" requires the subsequently amended guidelines to have a more limited reach. Congress's use of "only" shows that it "intended for 'federal crimes of terrorism' to supplant 'international terrorism,' rather than supplement it such that the adjustment covered both 'international terrorism' and 'federal crimes of terrorism.'" *Hasson*, 26 F.4th at 623. "Had Congress omitted 'only,' the Commission may well have preserved the adjustment's application to 'international terrorism." *Id*.

Congress's use of "only" limits the adjustment to one definition of terrorism, rather than several, but it does not follow that the new definition of terrorism will be narrower than the old. AEDPA broadened the adjustment in some respects and narrowed it in others. AEDPA required the adjustment to apply "more broadly," *United States v. Garey*, 546 F.3d 1359, 1361-62 & n.3 (11th Cir. 2008) (per curiam), in that it could apply to purely domestic terrorism. But AEDPA also limited the

27

adjustment's application to those offenses specifically listed in the definition of "Federal crime of terrorism," potentially excluding certain offenses that would have satisfied the definition of "international terrorism," such as state-law offenses. *Compare* 18 U.S.C. § 2332b(g)(5)(B) (defining "Federal crime of terrorism" as requiring a violation of specific listed statutes), *with id.* § 2331 (defining "international terrorism" as certain acts that "are a violation of the criminal laws of the United States or of any State" or that would be such a violation if committed within federal or state jurisdiction).

d.    Mohammed's resort to legislative history (Br. 20) is equally unavailing. He points to a committee report that states that the directive "will make that new provision applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes with the necessary motivational element," H.R. Rep. No. 104-518, at 123 (1996). "But legislative history is not the law." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (quotations omitted). "[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material," *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005), and "the statute here supports the Commission's

28

interpretation," *Hasson*, 26 F.4th at 624. In any event, the committee report on which he relies is at best ambiguous. *See Azar*, 139 S. Ct. at 1814 ("And even those of us who believe that clear legislative history can illuminate ambiguous text won't allow ambiguous legislative history to muddy clear statutory language." (quotations omitted)). "Although one could read" the quotation in question "as requiring a conviction for a federal crime of terrorism, one could also read it as stating a sufficient, but not necessary, condition for applying the adjustment." *Hassan*, 26 F.4th at 624. The committee report, in short, does not establish any conflict between Section 3A1.4 and the congressional directive.

### 2. Any error was not plain.

Even if this Court deemed Section 3A1.4 to be at odds with the 1996 directive, Mohammed would not be entitled to relief because any error is not plain. For an error to be "plain," it "must be clear or obvious, rather than subject to reasonable dispute." *Puckett*, 556 U.S. at 135. "Generally an error is plain if it contradicts circuit or Supreme Court precedent." *United States v. Laureys*, 653 F.3d 27, 32 (D.C. Cir. 2011) (per curiam) (quotations omitted). "Rarely do we find an error to be plain where this court has not ruled on the question." *Id.* (quotations omitted). "[I]ssues of

first impression present plain error only when they tread upon a well-established constitutional or legal principle." *Id.* at 33 (quotations omitted); *see United States v. Meadows*, 867 F.3d 1305, 1317 (D.C. Cir. 2017) ("That requires either controlling precedent on the issue or some other absolutely clear legal norm." (quotations omitted)).

The district court contravened no binding authority, and the principle on which Mohammed relies is not well-established, as no circuit has accepted it, the Fourth Circuit recently rejected it, and two others have rejected it implicitly. *See* p.31, *infra*; *see also Laureys*, 653 F.3d at 33 (principle not "'well-established'" where "every circuit to consider the issue" arrived at the contrary conclusion); *United States v. Williams*, 773 F.3d 98, 105 (D.C. Cir. 2014) (noting lack of authority from other circuits); *cf. United States v. Baldwin*, 563 F.3d 490, 492 (D.C. Cir. 2009) (per curiam) (holding that district court did not plainly err where the circuits were split).

Nor, for the reasons discussed above, pp.21-29, *supra*, is this a case where any error violates an "absolutely clear" legal norm. *Cf. In re Sealed Case*, 573 F.3d 844, 851 (D.C. Cir. 2009); *Long*, 997 F.3d at 357. Unlike in *Long*, 997 F.3d at 355-57, and *Sealed Case*, 573 F.3d at 848-52, no

other court of appeals has adopted Mohammed's view. To the contrary,
every court of appeals to have considered the question generally has held
that Section 3A1.4 may apply even where a defendant has not been
convicted of a federal crime of terrorism. *See* pp.20-21, *supra*. Among
those, the court that has considered Mohammed's specific argument
expressly has rejected it. *Hasson*, 26 F.4th at 621-24. Another court held
that a district court that had accepted similar arguments erred. *Arnaout*,
431 F.3d at 1001-02, *aff'g on other grounds*, 282 F. Supp. 2d 838, 843-45
(N.D. Ill. 2003). And as Mohammed acknowledges (Br. 22 n.2), a third
court has held that Section 3A1.4 applies where a defendant has not been
convicted of a federal crime of terrorism over a dissent that accepted
arguments like his. *Compare Graham*, 275 F.3d at 513-19, with *id.* at
529-37 (Cohn, J., dissenting). This Court need not "determine these
courts are correct to determine their view of the law is not plainly
erroneous." *Laureys*, 653 F.3d at 33.

## II.  The district court correctly resolved application of the Section 3A1.4 adjustment under the preponderance of the evidence standard.

Mohammed argues (Br. 23-33) that the district court should have
resolved application of the Section 3A1.4 adjustment under a clear-and-

convincing standard, but the district court correctly used a preponderance standard instead. This Court has never required the use of a clear-and-convincing standard, even when the enhancement would increase the guidelines range severalfold, and other courts have nearly uniformly used a preponderance standard even when applying Section 3A1.4.

### A.    Standard of Review

This Court reviews *de novo* the standard of proof that applies to sentencing enhancements under the Sentencing Guidelines. *United States v. Long*, 328 F.3d 655, 669 (D.C. Cir. 2003).

### B.    Discussion

#### 1.    The district court correctly applied a preponderance standard.

The district court correctly declined to apply a heightened clear-and-convincing standard of proof. As the Supreme Court observed in *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), a sentencing court's "application of the preponderance standard at sentencing" to find facts that inform the court's selection of a sentence within the prescribed statutory range "generally satisfies due process." *Id.* at 156 (quotations omitted).

32

Consistent with *Watts*, this Court has repeatedly approved the use of the preponderance standard at sentencing. *E.g.*, *United States v. Bras*, 483 F.3d 103, 107-08 (D.C. Cir. 2007).[5] Indeed, "[a] sentencing court may base a sentence on acquitted conduct, 'even when consideration of the acquitted conduct multiplies a defendant's sentence severalfold,' so long as the sentence does not exceed the statutory maximum and is based on conduct established by a preponderance of the evidence." *United States v. Bell*, 795 F.3d 88, 105 (D.C. Cir. 2015) (quoting *United States v. Jones*, 744 F.3d 1362, 1369 (D.C. Cir. 2014)).

Courts—excepting the Ninth Circuit—have declined to create an exception from the preponderance standard for the terrorism adjustment of Section 3A1.4. *See Arcila Ramirez*, 16 F.4th at 855 n.8 (rejecting argument that clear-and-convincing standard applies to § 3A1.4); *United States v. Stein*, 985 F.3d 1254, 1266 (10th Cir. 2021) (refusing to require heightened standard where application of § 3A1.4 increased guidelines

---

[5] *See also, e.g.*, *United States v. Fahnbulleh*, 752 F.3d 470, 481 (D.C. Cir. 2014); *United States v. Ventura*, 650 F.3d 746, 749 (D.C. Cir. 2011); *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008); *United States v. Dorcely*, 454 F.3d 366, 371-73 (D.C. Cir. 2006); *Long*, 328 F.3d at 670-71; *United States v. Jackson*, 161 F.3d 24, 26-27 (D.C. Cir. 1998).

ranges from approximately 15-20 years to life imprisonment); *United States v. Chandia*, 675 F.3d 329, 338-39 (4th Cir. 2012) (rejecting argument for a higher standard); *Graham*, 275 F.3d at 517 & n.19 (same); *see also Hasson*, 26 F.4th at 625 (identifying preponderance as the standard for application of § 3A1.4); *Fidse*, 862 F.3d at 523 (same); *Arnaout*, 431 F.3d at 1002 (same). *But see United States v. Alhaggagi*, 978 F.3d 693, 700-01 (9th Cir. 2020) (noting parties' agreement that clear-and-convincing standard applied to § 3A1.4 adjustment).

That line-up reflects the prevailing rule in the courts of appeals since the decision in *United States v. Booker*, 543 U.S. 220 (2005), which made the guidelines advisory. Although at one time "a divergence of opinion [existed] among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence," *Watts*, 519 U.S. at 156, courts have since recognized that the "debate has . . . been rendered academic" by *Booker*, *United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006). "With the guidelines no longer binding the sentencing judge, there is no need for courts of appeals to add epicycles to an already complex set of (merely) advisory guidelines by multiplying standards of

proof." *Id.*; *see also United States v. Grubbs*, 585 F.3d 793, 801 (4th Cir. 2009) ("Whatever theoretical validity may have attached to [an] exception to a preponderance of the evidence sentencing standard, the Supreme Court's decision in *Booker* and subsequent cases applying *Booker* have nullified its viability."); *United States v. Villareal-Amarillas*, 562 F.3d 892, 896-97 (8th Cir. 2009).

For example, the Third Circuit's pre-*Booker* decision in *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990), had suggested—without deciding—that due process might require using a clear-and-convincing standard of proof to find sentencing factors in some exceptional cases. *See id.* at 1102. The Third Circuit has since expressly repudiated that suggestion, recognizing that *Booker* obviated any prior doubts about sentencing judges' ability to "find facts by a preponderance of the evidence, provided that the sentence actually imposed is within the statutory range, and is reasonable." *United States v. Fisher*, 502 F.3d 293, 305 (3d Cir. 2007).

The only exception is the Ninth Circuit, whose decision in *United States v. Staten*, 466 F.3d 708 (2006), adhered to its pre-*Booker* rule that "when a sentencing factor has an extremely disproportionate effect on the

sentence relative to the conviction, the government must prove such a factor by clear and convincing evidence." *Id*. at 717 (quotations omitted). But *Staten*'s endorsement of the clear-and-convincing standard of proof "trace[d] back to," and relied heavily on, the Third Circuit's decision in *Kikumura*. *Id.* at 719; *see id.* at 719-20. The Third Circuit has since overruled that decision, explaining that any suggestion in *Kikumura* that due process requires a heightened standard of proof "was predicated on the then-mandatory nature of the Guidelines" and "does not survive *Booker*." *Fisher*, 502 F.3d at 305-06. As Mohammed recognized below, the concern of a sentencing enhancement that becomes the "tail which wags the dog of the substantive offense" is "abated now that the Supreme Court has clarified that the guidelines are advisory." JA.467 n.5 (quotations omitted).

### 2.    Mohammed's contrary contentions lack merit.

Mohammed offers several reasons why the circumstances of this case require this Court to demand, for the first time, a clear-and-convincing-evidence standard to a guidelines enhancement. Those contentions lack merit.

36

First, Mohammed errs (Br. 24-26) in arguing that the district court's rejection of a heightened standard "rested entirely on a misunderstanding of this Circuit's precedent." To the contrary, the district court correctly recognized that this Court has never endorsed the clear-and-convincing standard in situations where the Ninth Circuit would arguably apply it. JA.485-86; *see Long*, 328 F.3d at 670-71. The court was therefore correct when it wrote that Ninth Circuit cases applying the clear-and-convincing standard "are not authoritative as there is contrary law from this Circuit." JA.486.

Second, the "two unusual circumstances" Mohammed cites (Br. 27-29) as a basis to apply a heightened standard would not be "extraordinary" even under this Court's pre-*Booker* authority. Mohammed observes (Br. 27-28) that Section 3A1.4 raised his offense level by 12 levels and his criminal history category from I to VI. But since *Booker*, this Court has approved the use of a preponderance standard to resolve an even larger 16-level enhancement. *United States v. Fahnbulleh*, 752 F.3d 470, 481 (D.C. Cir. 2014). And even when the guidelines were mandatory, *Long* found nothing extraordinary in an eight-level increase "on the basis of conduct closely related to the charged

37

crimes," 328 F.3d at 671. Mohammed's terrorist activity could not be more closely related to his crime of conviction: Mohammed planned both the narcotics purchases and the terrorist activity with the same person (Jaweed), at the same time, and for the same purpose (killing the "infidels"). *See, e.g.*, JA.172.

Mohammed also suggests (Br. 28-29) that a heightened standard is appropriate because the district court imposed the enhancement based on a record that was marred by his trial counsel's deficient performance. Yet he cites no case from this or any other court holding that the ineffectiveness of trial counsel warrants a higher burden. To the contrary, even where counsel have failed to contest facts underlying guidelines calculations, courts applying the standard *Strickland* prejudice analysis have not done so using a clear-and-convincing standard.[6] *See United States v. Lutcher*, No. 03-cr-338, 2009 WL 1457980, at *8 (E.D. La. May 26, 2009); *see also Williams v. United States*, No. 08-

---

[6] *Strickland v. Washington*, 466 U.S. 668 (1984), requires a defendant challenging effectiveness of counsel to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.

cv-513, 2010 WL 1382762, at *6-*7 (S.D. Ala. Mar. 3, 2010), *report and recommendation adopted*, 2010 WL 1382761 (S.D. Ala. Apr. 1, 2010).

Moreover, any concern about counsel's ineffectiveness would be addressed by the requirement that the evidence on which the district court bases the adjustment be reliable. *See* U.S.S.G. § 6A1.3; *Fahnbulleh*, 752 F.3d at 481. No such concerns arise here: while counsel's ineffectiveness may have kept testimony impeaching Jaweed from the jury at trial, the district court had the benefit of all relevant information at resentencing, as the court considered the unrebutted declarations of Mohammed's proposed witnesses and found Jaweed credible anyway. JA.493-95. *See generally Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575-76 (1985) (noting the deference due a trial judge's credibility determination).

Third, Mohammed's response that "[a] defendant's due process interest does not apply only when ascertaining the *maximum* sentence, but also to the facts that '*actually* are determinative of the sentence given,'" Br. 30 (quoting *Staten*, 466 F.3d at 719), misses the mark. That approach would require a heightened standard of proof not only for every guidelines calculation, but also for every factor a district court considers

under 18 U.S.C. § 3553(a)—a view the Supreme Court has rejected. *See Watts*, 519 U.S. at 156; *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008). And while Mohammed correctly notes (Br. 30) that both *Townsend v. Burke*, 334 U.S. 736, 741-42 (1948), and *United States v. Booze*, 108 F.3d 378, 381 (D.C. Cir. 1997), recognize the need for district courts to sentence based on accurate information, neither holds that due process requires courts to evaluate the accuracy of information using a clear-and-convincing standard. Indeed, *Booze* underscores the contrary point by stating that the government need only prove sentencing facts by a preponderance. 108 F.3d at 381.

## III. The district court did not plainly err in finding that Mohammed's drug-trafficking offense was intended to promote a federal crime of terrorism.

Mohammed argues (Br. 33-42) that, even if the district court applied the correct standard of proof, it erred in enhancing his sentence under U.S.S.G. § 3A1.4. But two established doctrines of sound judicial administration (law of the case and law of the circuit) counsel against reaching Mohammed's argument, which tracks one this Court rejected already on direct appeal in a precedential opinion. And Mohammed

40

cannot establish clear error in this Court's previous ruling or the district court's findings at resentencing.

## A.    Legal Framework and Standard of Review

Section 3A1.4 provides a 12-level upward adjustment and an automatic criminal history category of VI when "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." A "federal crime of terrorism" has two elements: (1) the commission of a listed felony that (2) was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5).

At resentencing, the district court found that Mohammed's drug-trafficking offense was intended to promote various federal crimes of terrorism on two alternative bases: first, the court found that Mohammed intended to use the proceeds of drug-trafficking to purchase a car and to use the car to transport missiles; second, the court found that Mohammed intended to use proceeds of drug-trafficking to promote narcoterrorism. JA.488-91, 494-95.

Mohammed disputes only limited aspects of those determinations. For example, excepting narcoterrorism, *see* pp.54-59, *infra*, Mohammed

41

does not contest in this Court that he planned to use missiles to commit offenses that are listed as "federal crimes of terrorism" in the statute or that such offenses were "calculated" to influence or affect or retaliate against government conduct. That is with good reason. The record shows that Mohammed repeatedly described his possession of weapons and intent to obtain and transport missiles,[7] and expressly stated his intent to use these weapons to attack the airport and U.S. nationals or an Afghani police station.[8]

Instead, Mohammed argues that the district court clearly erred in its finding that he intended his drug trafficking to promote his commission of federal crimes of terrorism. The determination that a defendant intended to promote a federal crime of terrorism is a factual finding that this Court normally reviews for clear error. *United States v. Mohammed*, 693 F.3d 192, 201-02 (D.C. Cir. 2012) (*Mohammed I*).

---

[7] *See* JA.88-89, 92, 109-10, 113, 123-24.

[8] JA.91 ("We can place and explode bombs and fire missiles toward the airport."), *ibid.* ("What they do is to kill the Americans. The Americans are infidels and Jihad is allowed against them."), JA.92, 115; *see* JA.71.

"Clear error review is exacting: to reverse a district court's findings of fact we must be left with the definite and firm conviction that a mistake has been committed." *Id.* at 202 (quotations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson*, 470 U.S. at 574 (citation omitted). This Court gives "the greatest deference" to the "district court's credibility determinations." *United States v. Erazo*, 628 F.3d 608, 611 (D.C. Cir. 2011) (quotations omitted); *see Anderson*, 470 U.S. at 575.

Accordingly, if it reaches the issue at all, *but see* pp.44-49, *infra* (arguing that this Court should not address this issue at all), the Court should review the district court's findings for, at most, clear error.[9]

---

[9] It is doubtful that Mohammed preserved this argument. Mohammed argued below that the district court should not credit Jaweed's testimony and could not find the requisite intent to promote without it. JA.469-71. He did not argue that the timing of his statements about the car defeats a finding of intent. *See* JA.488 (observing that Mohammed "proffers little argument to counter Mr. Mohammed's own words"). But because Mohammed cannot overcome even the deferential clear-error review due a preserved challenge, the government assumes

43

**B.    The law-of-the-case and law-of-the-circuit doctrines bar review.**

Mohammed's main factual contention is that "there is simply no basis for drawing an inference that Mohammed intended to use the specific car purchased from the drug proceeds" to "participate in a terrorist attack that involved moving missiles in a car." Br. 35; *see* Br. 34-39. Because, however, this Court already rejected that argument in Mohammed's first appeal, *Mohammed I*, 693 F.3d at 201-02, the law-of-the-case and law-of-the-circuit doctrines bar review at this stage.

1.    "When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered in the first appeal should not be revisited on later trips to the appellate court." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (quotations omitted). "This is especially so," this Court has explained, where "each of those appeals was heard by a different panel." *United States v. Philip Morris USA Inc.,* 801 F.3d 250, 257 (D.C. Cir. 2015). Because one panel has "no authority to overrule another, 'an even stronger than usual version of the law-of-the-case doctrine,' law of

---

*arguendo* that Mohammed did not forfeit this point. *Cf. United States v. Gatling*, 96 F.3d 1511, 1521 n.3 (D.C. Cir. 1996).

44

the *circuit*, governs." *Id.* (quoting *LaShawn A.*, 87 F.3d at 1395). "[W]hen both doctrines are at work, the law-of-the-circuit doctrine should increase a panel's reluctance to reconsider a decision made in an earlier appeal in the same case." *LaShawn A.*, 87 F.3d at 1395.

This case presents just such a confluence of the two doctrines. In his first appeal, Mohammed argued that his (since-vacated) narcoterrorism conviction did not qualify as a federal crime of terrorism because it was not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" as required by 18 U.S.C. § 2332b(g)(5)(A). Appellant's Br. 57-62, *United States v. Mohammed*, No. 09-3001 (filed Sept. 9, 2011). As summarized by this Court, he argued that "the evidence does not establish that he intended to use the drug proceeds to buy a car to aid in the Jalalabad attack." *Mohammed I*, 693 F.3d at 201. He pointed to two statements. First, in one conversation with Jaweed, "Mohammed stated that they would 'tightly and firmly load [the missiles] in our car and bring [them]' for use in the planned attack." *Id.*; *see* JA.124. Second, "[e]leven days later, he told Jaweed he intended to use his portion of the proceeds of the drug sales to purchase a car." *Mohammed I*, 693 F.3d at

201; *see* JA.151. He "claim[ed] that his statements cannot be read to support the conclusion of the district court that he was referring to the same car that he said earlier would carry the missiles." *Mohammed I*, 693 F.3d at 201. This Court rejected this argument, holding that "it is far from proof that the district court's reading of these conversations is clearly erroneous." *Id.* Instead, it recognized that "[t]he district court pointed to specific statements in the record—which Mohammed does not dispute he made—from which it drew plausible inferences." *Id.* at 202.

Mohammed now points (Br. 34-37) to these same statements to again argue that the district court clearly erred in finding that he intended to use a car purchased with drug proceeds to commit terrorism. To be sure, Mohammed appears to train his argument on a different component of the Section 3A1.4 inquiry—the "intent to promote" prong, rather than the requirement that the crime be calculated to influence the conduct of government or to retaliate against government conduct. But the core of his factual submission—*i.e.*, that "there is simply no basis for drawing an inference that Mohammed intended to use the specific car purchased from the drug proceeds" for terrorism (Br. 35)—is the same as

46

in the first appeal. The law-of-the-case and law-of-the-circuit doctrines bar review of that challenge.

2.    Mohammed's efforts to avoid that conclusion fail. He argues (Br. 39) that this Court should not apply the law-of-the-case doctrine because he has "now identified [evidence] that *does* directly contradict the District Court's finding." He primarily relies (Br. 35-36) on evidence purportedly showing a "fundamental mismatch" between the timing of the drug sales and the timing of the planned attack. But the additional evidence Mohammed cites is cumulative. This Court already considered that Mohammed discussed purchasing a car eleven days after he discussed using it to transport missiles and nonetheless rejected his argument that his "statements cannot be read to support the conclusion of the district court that he was referring to the same car that he said earlier would carry the missiles." *Mohammed I*, 693 F.3d at 201.

In any event, to the extent Mohammed musters additional facts from the trial record in support of this same argument, this Court should not consider it anew. *See United States v. Brice*, 748 F.3d 1288, 1289 (D.C. Cir. 2014) (prohibiting a party from raising in a second appeal an argument it could have raised in a first). Although Mohammed argues

47

that he has now identified contradictory evidence, he relies on facts available to him at the time of his first appeal.

Mohammed argues that the law-of-the-case doctrine "does not apply in situations where a prior decision is 'clearly erroneous'—which, of course, is the same standard required to reverse the District Court's factual findings." Br. 39 (citation omitted). The law-of-the-case doctrine does include an exception where the prior appellate decision was "clearly erroneous and would work a manifest injustice." *LaShawn A.*, 87 F.3d at 1393 (quotations omitted). But Mohammed would not merely be asking this Court to recognize prior *district court* findings as clearly erroneous; he would be asking this Court to hold that the *Mohammed I* panel's decision was itself clearly erroneous. *See id.* at 1393-94. Moreover, this Court has recognized no similar clear-error exception to the law-of-the-circuit rule. *United States v. Haight*, 850 Fed. App'x 5, 6 (D.C. Cir. 2021) (per curiam) (unpublished); *see LaShawn A.*, 87 F.3d at 1395 (recognizing that "the law-of-the-circuit doctrine is much more exacting" and reserving question of whether it includes an exception for decisions that are "clearly erroneous and would work a manifest injustice" (quotations omitted)). Even if such an exception existed, it would not apply here,

48

where the *Mohammed I* panel committed no error, much less a clear error, in rejecting Mohammed's previous attack on the district court's factual findings.

### C. The district court did not clearly err in finding that Mohammed intended his drug-trafficking offense to promote a federal crime of terrorism.

If this Court reaches Mohammed's timing argument, it should reject it. The district court did not commit clear (or plain) error in finding that he intended to use drug-trafficking proceeds to purchase a car and to use that car to transport missiles.

### 1. The district court's finding that Mohammed intended to promote terrorism crimes by using drug-trafficking proceeds to purchase a car to transport missiles is not clearly erroneous.

a. As this Court determined in Mohammed's initial appeal, the record adequately supports the district court's finding that Mohammed intended to promote a federal crime of terrorism by using the commission from drug sales to purchase a car and by using the car to transport missiles to attack either the Afghani police station or the Jalalabad airport. JA.197-99, 201, 489; *see Mohammed I*, 693 F.3d at 201-02.

First, the record shows that Mohammed planned to purchase a car with commissions from drug sales. In one conversation, Jaweed and

Mohammed discussed the planned opium transaction, and Mohammed told Jaweed that Jaweed should tell his buyer that "as much as you need we have it." JA.151. Shortly thereafter, Jaweed responded that his buyer is a "good guy" and that "[i]f you and I had arranged a few good deals for him, I swear by God after the third deal our business would have been a greatest business where you would have said 'very good.'" *Ibid.* Mohammed replied that "if we get some money" then they would "buy a car . . . for business." *Ibid.*

Second, the district court did not clearly err in finding that Mohammed planned to use the car to transport missiles. In another conversation, Jaweed and Mohammed discussed how Jaweed would go to another place to obtain missiles to replace missiles he had purportedly lost. *See* JA.117-20, 122-24. Jaweed said that if he found missiles, he would call Mohammed, and Mohammed responded that "[t]he car is ours, wherever we get it, we will bring it from there." JA.123. Mohammed explained that "we will tightly and firmly load it in our car and bring it[.]" JA.124.

b.    Mohammed challenges (Br. 34-39) the district court's finding that he intended the commissions from his drug sales to finance the

purchase of a car to transport missiles, but this argument "is far from proof that the district court's reading of these conversations is clearly," much less plainly, "erroneous." *Mohammed I*, 693 F.3d at 201.

Mohammed argues (Br. 35) that he "plainly already had the car that was the subject of his August 30 comments about moving things, and did not intend for the car purchased with drug proceeds to serve that function." The district court did not clearly err in rejecting this argument.

Mohammed made several statements about cars on the recordings. On August 18, 2006, he told Jaweed that "[w]hen you do an attack, if successful then we will give you a lot of money" and that "God willing, there is enough money in this to get you a car." JA.93. That same day, he said, "we have a lot of friends here" and "I share my car and drive around this way and that way so I can be trusted." JA.94. On August 30, Mohammed told Jaweed that "[t]he car is ours, wherever we get it, we will bring it from there" and that "we will tightly and firmly load it in our car and bring it[.] They don't search around noon time." JA.123-24. On September 6, Mohammed told Jaweed that he had been "collecting opium and then wanted to sell all at one time," but that he had "quit this" and was not "buying and selling it." JA.140. He continued: "So I bought a car

51

in partnership with him, hoping to invest my money but now, Jaweed! The loss is in ten thousands and the profit is none." *Ibid.* And on September 10, Mohammed told Jaweed that "if we get some money we will buy a car . . . for business." JA.151.

The district court could plausibly conclude from these statements that Mohammed intended to use the same car that he obtained by selling drugs to transport missiles. Although, as Mohammed observes (Br. 35), he spoke of transporting missiles in a car before he spoke of using drug proceeds to buy a car, the record also shows that he had he sold drugs before he had an opportunity to transport missiles. Given that Mohammed made these statements relatively close in time, and in the absence of any evidence that he had abandoned his intent to use a car to transport missiles, the district court could plausibly find that Mohammed maintained that intent at the time he sold drugs.

Further, using funds obtained by selling drugs to purchase or obtain access to another car would have promoted Mohammed's planned terrorism by allowing him to better avoid suspicion. Mohammed stated that he used the first car he mentioned to show his trustworthiness, JA.94, and frequently stated his desire for secrecy, *e.g.*, JA.89, 95, 111.

52

He also expressed concern about encountering searches while transporting missiles. *See* JA.124. Obtaining a second car could help Mohammed avoid suspicion and apprehension.

That Mohammed did not get a chance to purchase a car with drug proceeds or use it to transport missiles does not matter. "[I]t is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered" even if the defendant "lacked both the means and the ability to carry out his defined activity without assistance that was not present." *Mandhai*, 375 F.3d at 1248; *see Kobito*, 994 F.3d at 703 (holding adjustment applied even if defendant "couldn't be convicted of an attempt or conspiracy").

Even if Mohammed is correct (Br. 36-37) that when he described his intent to obtain a car "for business," he meant that he intended to use it for drug dealing, that would not have prohibited him from also using it for terrorism. *See Mohammed I*, 693 F.3d at 202 ("That Mohammed may have intended the car for personal use does not mean he could not also have planned to use the car in the attack, and he identifies no evidence directly contradicting the district court's conclusion that he did."). In

53

short, as this Court concluded on direct appeal, the district court did not clearly err in finding the requisite intent to promote.

> **2.    The record also supports the district court's alternative finding that Mohammed intended his drug trafficking to promote narcoterrorism.**

The record also supports the district court's alternative finding that Mohammed intended to promote the offense of narcoterrorism, in violation of 21 U.S.C. § 960a. JA.491.

a.    At the resentencing, the government advanced the additional argument that Mohammed intended to promote the separately listed offense of narcoterrorism, as defined in 21 U.S.C. § 960a. *See* JA.444. Section 960a "criminalizes conduct abroad that would violate domestic drug laws if 'committed within the jurisdiction of the United States' when the actor 'know[s] or intend[s] to provide, directly or indirectly, anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity . . . or terrorism.'" *Mohammed I*, 693 F.3d at 199 (quoting 21 U.S.C. § 960a).

The record supports the court's alternative finding that Mohammed indeed intended to promote that crime. The record shows that Mohammed intended his drug trafficking to promote further drug

trafficking that was intended to provide something of value to himself. When Jaweed explained that his purported customer was a "good guy" and "[i]f you and I had arranged a few good deals for him, I swear by God after the third deal our business would have been a greatest business where you would have said 'very good,'" Mohammed responded that when they obtained money, they could buy a car "for business," and that "[o]nce we have money, then the money will keep coming." JA.151; *see* JA.78 ("He's trying to say that once we have more money invested or more capital, then more—it will generate more money and commission."). Indeed, Mohammed accepts that this exchange can naturally be read to show "that Mohammed intended to use the car for additional *drug* activity, not terrorist attacks." Br. 36.

The record further supports the district court's finding that Mohammed is a "dangerous terrorist." *See* p.42 & nn.7-8, *supra*; *see also* JA.514 ("He's a dangerous terrorist."); JA.203 ("I think it's clear that you're a terrorist."). And Jaweed's testimony, which the district court credited, makes clear that that Mohammed is a member of the Taliban. *E.g.*, JA.55-61, 64-66, 70, 72-75, 76, 77; JA.514 ("He had connections to the Taliban and a clear hatred of Americans from his statements."); *cf.*

*United States v. Mohammed*, 863 F.3d 885, 892 (D.C. Cir. 2017) (*Mohammed II*) (noting that "Jaweed's testimony provided the only unambiguous link between Mohammed and the Taliban"). Mohammed stipulated that the Taliban is a terrorist organization. JA.49.

Lastly, the narcoterrorism offense Mohammed intended to support was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *See* 18 U.S.C. § 2332b(g)(5)(A). Providing support to a terrorist organization intending or knowing the organization's goals of influencing, affecting, or retaliating against government conduct satisfies the "calculated" requirement. *See United States v. Ali*, 799 F.3d 1008, 1031-32 (8th Cir. 2015); *United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011); *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011); *see also Awan*, 607 F.3d at 317. This reasoning applies even more strongly where Mohammed intended to provide pecuniary value to himself knowing how his own activities were calculated to influence or affect or retaliate against government conduct. *See* p.42 n.8, *supra*.

b.    Mohammed's contrary arguments fail to establish clear error in the district court's determination. It is true, as Mohammed observes

(Br. 40-41), that the district court (and the government) imprecisely stated that he "intended to *commit* the crime" of narcoterrorism, JA.491 (quotations omitted; emphasis added), instead of stating, as Section 3A1.4 requires, that his offense was intended to *promote* a listed crime.

In context, however, the district court's statement is best understood as a finding that Mohammed intended to promote the crime of narcoterrorism. To begin, intending to *commit* an offense is one way of intending to *promote* it. Further, the district court's statement immediately follows a paragraph in which the court found that Mohammed's "recorded admissions demonstrate that Defendant's offense 'intended to promote' several crimes," including destruction of aircraft and aircraft facilities, homicide of United States nationals outside the United States, and others. JA.491. Lastly, both findings lie within a section with the heading "Proceeding under the 'Intended to Promote' Prong." JA.487.

Mohammed himself is imprecise when he argues (Br. 41) that the government must "point to evidence that Mohammed intended for those hypothetical future drug sales to 'influence or affect the conduct of government' or 'to retaliate against government conduct.'" As applied

here, Section 3A1.4 requires evidence that the offense Mohammed intended to promote—narcoterrorism, *i.e.*, the sale of drugs to provide pecuniary value to a terrorist—was so calculated. As discussed above, pp.56, *supra*, the evidence shows that it was.

Mohammed's final objection (Br. 41) is procedural in nature—*i.e.*, that the government forfeited the argument that Mohammed "intended to use the proceeds of this sale to fund *future* drug purchases that would provide pecuniary value to a terrorist." But the government's submission that Mohammed intended to commit narcoterrorism was, in substance, an argument that he intended to promote future drug sales that would provide pecuniary value to a terrorist.

This case therefore differs from *United States v. Smith*, 896 F.3d 466, 472 (D.C. Cir. 2018), on which Mohammed relies (Br. 41). There the government sought to raise a guidelines calculation error to which it never objected in the district court as an alternative basis for denying a defendant a different form of relief. Here, by contrast, the government pursued this line of argument below, albeit imprecisely. At the least, the government should be afforded "a measure of latitude to elaborate on [its] theory in service of the same argument." *Shea v. Kerry*, 796 F.3d 42, 54

58

(D.C. Cir. 2015); *see Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995).

## IV. This Court should not hold this case in abeyance while the Sentencing Commission considers whether to amend the guidelines to address acquitted conduct.

Mohammed asks (Br. 42-44) this Court to hold this case in abeyance while the Sentencing Commission considers an amendment concerning the use of acquitted conduct at sentencing, but this Court should decline.

First, the amendment would not help Mohammed because the conduct underlying his now-vacated narcoterrorism conviction is not "acquitted conduct." Relevant here, the proposed amendment defines "acquitted conduct" to mean "conduct (i.e., any acts or omission) underlying a charge of which the defendant has been acquitted by the trier of fact or upon a motion of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure." *See* Sentencing Guidelines for the United States Courts, 88 Fed. Reg. 7180-01, 7225 (Feb. 2, 2023). Mohammed's conviction was vacated because of his counsel's ineffectiveness, JA.414, so the proposed amendment would not help him.

Second, the guidelines that apply are those in force at sentencing. U.S.S.G. § 1B1.11. The proposed amendment would apply retroactively

59

only as provided by the Sentencing Commission. *See generally Dillon v. United States*, 560 U.S. 817, 824-26 (2010). Mohammed relies (Br. 43) on *United States v. Smaw*, 22 F.3d 330, 333 (D.C. Cir. 1994), but *Smaw* considered a clarifying, rather than substantive, amendment, and Mohammed does not argue that the proposed amendment would be clarifying. *Concepcion v. United States*, 142 S. Ct. 2389, 2400 (2022), on which Mohammed also relies (Br. 43-44) observed that district courts may consider amended guidelines when resentencing a defendant for some other reason but did not suggest amended guidelines provide a basis for resentencing in themselves.

Third, after Mohammed filed his brief, the Sentencing Commission elected not to promulgate the amendment as part of its 2023 amendments. *See* 88 Fed. Reg. 28254-01 (May 3, 2023); Hearing Tr. at 23 (Apr. 5, 2023) (deferring consideration to next year).[10] Whether the Commission will adopt an amendment relating to this issue, and what form it will take, is a matter of speculation and no basis to delay this case.

---

[10]    Available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20230405/20230405_transcript.pdf.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court.

Respectfully submitted,


KENNETH A. POLITE, JR.
    Assistant Attorney General

LISA H. MILLER
    Deputy Assistant Attorney General

*/s/ J. Benton Hurst*

KAITLIN J. SAHNI          J. BENTON HURST
    Trial Attorney              Trial Attorney
    Criminal Division,          Criminal Division, Appellate Section
    Narcotic and Dangerous      U.S. Department of Justice
        Drugs Section           400 E. 9th St., Ste. 5510
                                Kansas City, MO 64106
                                (816) 426-3122
                                john.benton.hurst@usdoj.gov

July 28, 2023

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record certifies that the foregoing Appellee Brief for the United States was this day served upon counsel for appellant, by notice of electronic filing with the District of Columbia Circuit CM/ECF system.

Dated: July 28, 2023

*/s/ J. Benton Hurst*
J. BENTON HURST
  Trial Attorney
  Criminal Division, Appellate Section
  U.S. Department of Justice
  400 East 9th Street, Room 5510
  Kansas City, MO 64106
  (816) 426-3122
  john.benton.hurst@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,871 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Century Schoolbook 14-point font in text and Century Schoolbook 14-point font in footnotes.

3. This brief complies with the privacy redaction requirement of Fed R. App. 25(a)(5) because it contains no personal data identifiers.

4. The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk; and

5. This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.7, which is continuously updated, and according to that program is free of viruses.

Dated: July 28, 2023

/s/ *J. Benton Hurst*

J. BENTON HURST
  Trial Attorney
  Criminal Division, Appellate Section
  U.S. Department of Justice
  400 East 9th Street, Room 5510
  Kansas City, MO 64106
  (816) 426-3122
  john.benton.hurst@usdoj.gov